## Case No. 9,620.

MILNOR v. NEW JERSEY R. CO. et al.
SHARDLOW v. SAME. BIGELOW v.
SAME. MILNOR v. NEWARK PLANK
ROAD CO. et al. SHARDLOW v. SAME.

[6 Am. Law Reg. 6; 3 Wall. (70 U. S.) Append.
782; 16 Lawy. Ed. U. S. Sup. Ct. Rep.
Append. 1.]

Circuit Court, D. New Jersey. Sept. 22, 1857.[1]

BRIDGES—NAVIGABLE RIVER—POWER TO ENJOIN—
ACT OF LEGISLATURE—EXCLUSIVE PRIVILEGE—
EMINENT DOMAIN — CHANGING DIRECTION AND
POSITION.

1. A court of the United States has no juris-
diction to restrain by injunction the erection of
a bridge over a navigable river lying wholly with-
in the limits of a particular state, where such
erection is authorized by the legislature of the
state, though a port of entry has been created by
congress above the bridge. Dicta in Devoe v.
Penrose Ferry Bridge Co. [Case No. 3,845],
overruled; and in Pennsylvania v. Wheeling
Bridge Co. 13 How. [54 U. S.] 579, explained.

[Cited in Woodman v. Kilbourn Manuf'g Co.,
Case No. 17,978; Silliman v. Hudson River
Bridge Co., Id. 12,852; Same v. Troy & W.
T. Bridge Co., Id. 12,853; Miller v. New
York, Id. 9,585.]

2. Construction of acts of the legislature of
New Jersey with regard to the proprietors of
the bridges over the rivers Passaic and Hacken-
sack, and the agreements made thereunder with
respect to these rivers.

3. If such acts and agreements give to the
corporation a franchise or exclusive privilege of
taking toll, and erecting a bridge on these rivers,
that franchise or privilege may be taken by the
legislature of the state, under its right of eminent
domain, on providing compensation.

4. Such franchise or exclusive privilege, if it
exists, is vested in the corporation at large and
not in the individual members, and may be
waived or relinquished by the action of a ma-
jority of the corporators.

5. The mere establishment of a particular line
of road, and erection of a bridge in a particular
location, in a town, by a railroad company, after
a controversy with the inhabitants with respect
thereto, does not amount to a contract so as to
preclude the company, after a lapse of time,
from changing the direction of their line and the
position of the bridge.

These were several bills in equity, [by
Charles E. Milnor against the New Jersey
Railroad Company and others; William L.
Shardlow against the same; David Bige-
low against the same; Charles E. Milnor
against the Newark Plank Road Company
and others and William L. Shardlow against
the same,] for injunctions and other relief,
upon the facts and for the purposes set
forth in the opinion below. Interlocutory
injunctions had been granted, and is now
upon final hearing.

[2] [The constitution gives to congress power
"to regulate commerce with foreign nations,
and among the several states." With this
clause in force, as the supreme law of the
land, Milnor and others, citizens of New
York, and owning wharves in the city of

Newark, New Jersey, but not navigators,
pilots or anything of that sort, filed their
bills in the circuit court of the state just
named to restrain the New Jersey Railroad
Company and others from erecting two cer-
tain bridges over the Passaic, one in the city
of Newark, at a point called the "Com-
mercial Dock," the other at a point about
two and a half miles below the wharves of
the town. This company's road forms a
link in the chain of roads which connect
New York with Philadelphia, and so the
North and South. The company had been
for many years running its trains over a
bridge at the upper end of the town; but
in crossing the river at that point they were
obliged to make their road describe a curve,
much in the shape of an S, carrying it,
moreover, through populous parts of the
city, and causing as they said, delays and
dangers. The purpose of the new bridges
was, therefore, to shorten and straighten
the road.

[The bridges in controversy were author-
ized to be erected by statute of the state of
New Jersey. They were required by this
statute to have pivot-draws, leaving two
passages of sixty-five feet each for the pass-
age of vessels navigating the river. As to
their effects on the navigation, the com-
plainants brought a large number of wharf
owners, captains of sloops, schooners, and
of little steamboats, who gave it as their
"opinion," that the bridges could not be
erected without obstructing the navigation
by the detention of ice, and by causing bars
and shoals in the river, and without sub-
jecting sailing vessels, especially, to a de-
tention for a change of tide and wind, or
for daylight and to inconveniences and haz-
ards generally; while it would probably sub-
ject wharf property above the bridges to a
depreciation of from twenty-five to fifty per
cent., break up a system of tow-boats that
had got established in that river, and raise
the price of freights; since "you can't get
no man to go through these bridges with-
out extra pay; they all have such a dread
of bridges, which, if there are currents, fre-
quently break sails and rigging, and some-
times injure their hulls." But the case did
not thus strike everybody. The railroad
company proved, or brought witnesses to
prove that "not only would the proposed
bridge offer no material obstruction to navi-
gation, but by replacing the present bridge
at Centre street, would actually improve the
general navigation of the river, and enhance
the general value of wharf property on the
river, and by effecting the removal of the
railroad track now running in rear of the
intermediate wharves, would result in very
little, if any, damage to any of them." As
respected the advantages to the railroad,
and the improved safety to travellers, while
the complainants admitted that the road
was a great thoroughfare, and that cross-
ing on the old bridge obliged the trains to

---

[1] [Affirmed by supreme court. See 16 Lawy.
Ed. U. S. Sup. Ct. Rep. Append. 1.]

[2] [From 3 Wall. (70 U. S.) 782.]

of the Wheeling Bridge Case, that the commerce on the Schuylkill below the port of Philadelphia was entitled· to as much protection as that of the Ohio, Mississippi, Delaware, or the Hudson.

[For the defendants: Granting to the Wheeling Bridge Case [supra] the fullest weight, it is no :precedent for this. The jurisdiction there exercised was invoked upon the proposition that "the river Ohio is a highway of commerce, regulated by congress." That river is an enormous river, forms the boundary of six states, and is navigable through them and four other states for a thousand miles. State laws had not regulated it at any time, except to make it free, while it had been regulated by congress in every way. By the ordinance of 1787, its waters had been declared to be common highways, and forever "free." Virginia had, in 1789, when desiring that Kentucky should be admitted into the Union, declared that its navigation should be "free and common to all citizens of the United States," to which act congress assented; and it ·thenceforth became a compact between Virginia and all other states. Successive appropriations were made by congress for the removal of obstructions to its navigation; and, finally, when Virginia applied in four several instances—1836, '37, '38, and '43—for the passage of a law to authorize the construction of a bridge at Wheeling, she met in each case with refusal. We refer to these facts being public ones. The "regulation" by congress had, therefore, been made, as we have said, "in every way"—by what that body did, and by what it prevented —made affirmatively, and made negatively. Now as respects the Passaic, in the first place its character and geographical position are wholly different from that of the Ohio. It is a very small stream; it rises, flows, and discharges itself within one state—a small one. No question can arise from its flowing through or past any other state. Then, no regulation of congress worth naming has ever touched it, while the state in which it lies, and whose river it is, has exercised an early and continued control over it.

[The remarks about nuisance made by McLean, J., in giving the opinion of the court, are extra-judicial. They have tended perhaps to mislead the professional mind; certainly, they were unnecessary to the decision of the cause, and if meant to be applied to the case of a bridge authorized by statute, and built according to the statute, are not well founded in law. The fact that a bridge is below a port of entry does not necessarily make it a nuisance; nor was that the point adjudged in the Wheeling Bridge Case. The case before the court bears far greater, and indeed a close analogy to Wilson v. Blackbird Creek Company, 2 Pet. [27 U. S.] 257. Blackbird creek was "one of those many creeks passing through a deep level marsh adjoining the Delaware, up which the tide flows for some distance." Under incorpora-

tion from the state of Delaware, certain persons to increase the value of property along its banks, and to improve the health of the region by draining the marsh, erected a dam. This dam Wilson broke down; and on tres· pass brought against him by the company, the question was, whether the authorization of the dam was void as repugnant to the constitution, the counsel for the company arguing that it came in conflict with the power of the United States "to regulate commerce with foreign nations and among the several states." The court held, unanimously, that it was not repugnant to the constitution. Marshall, C. J., giving his opinion, says: "The value of property on the banks of the creek must be enhanced by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the states. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it; but this abridgment, unless it comes in conflict with the constitution, or a law of the United States, is an affair between the government of the state and its citizens, of which this court can take no cognizance. If congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the Middle and Southern states, we should not feel much difficulty in saying that a state law coming in conflict with such an act would be void; but congress has passed no such act. We do not think that the act can, under all the circumstances of the case, be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject." This great chief justice does here admit that it is not every obstruction of every navigable stream by the state, nor even the complete stoppage by it of some navigable streams, which will constitute an interference with the constitutional power of congress to regulate commerce. He speaks of the matter as a relative· question, and says, that, "under all the circumstances of the case," the act of the state could not be considered as such an interference. This relative character of this class of questions is what we maintain. He admits, impliedly, too, that it is not every act of congress legislating about a stream which will be a regulation of commerce in regard to it. "Had congress passed an act the object of which was to control state legislation over these small navigable creeks, such an act," he says, "would have made the state legislation void." We invoke, then, his high authority. When Mr. Burke, on the out break of the French

make a curve, they denied that the curve caused delay or danger to the road, or that any new track was necessary. They showed that the road had been very profitable, making for years dividends of not less than ten to fifteen per cent. while, on the subject of accident, they cited the report of the directors to the stock-holders for 1853 and 1854, in the former of which the directors say, with a spirit of piety which left no doubt that they spoke the truth: "It is a subject for thankfulness and praise to the Almighty Governor of the Universe, that on the 21st anniversary, the board are enabled to announce the fact, that although—including commuters and others—more than 13,000,000 of persons have been transported on the road, no person within the cars has suffered in life or limb." While in the latter they continue in the same strain of gratitude and sense of obligation: "The exemption from serious accidents which has attended the operations of the company during the past year is cause of sincere thankfulness. The gratifying record that no person transported on the road has been injured in life or limb, while in the cars, is still true, though the whole number of passengers since the opening of the road exceeds 15,000,000. Such favorable results, while they entitle those having charge of the condition of the road and the running of the trains to high commendation for their vigilance and care, also increase our obligations to a kind, protecting providence. No doubt is entertained that the net earnings will be ample for the cash dividend of ten per cent. per annum, and a handsome surplus applicable to such construction as shall increase the value and usefulness of our work."

[For the complainants: The case of Pennsylvania v. Wheeling Bridge, 13 How. [54 U. S.] 519, governs this. In that case the bridge company, under authority from the legislature of Virginia, undertook to erect a bridge over the Ohio at Wheeling. The Ohio at this point was wholly in her own state. She erected the bridge. When erected it did not destroy the navigation at all, though it impeded it somewhat, rendering it less free. The state of Pennsylvania, having large canals and railways terminating on the Ohio, and which she represented, had been built with direct reference to free navigation of that river, filed her bill to abate the bridge as a nuisance. Her allegation was, indeed, that the bridge had been built "under color of an act of the legislature of Virginia, but in direct violation of its terms." The legislature of Virginia, however, passed at once an act declaring that the bridge as constructed was constructed "in conformity with the intent and meaning of the charter." The bridge as erected existed therefore, under the authority of the state. It was constructed under skilful engineers, and no otherwise impeded navigation probably than any bridge in any large river generally impedes navigation; rendering it less

free. Most steamers with stiff smoke-pipes would have been able to pass as it was; any steamer with flexible pipes—pipes on hinges—could certainly have done so. The court, however, declared that the bridge was a nuisance, and directed it to be abated, unless so raised and altered as to leave the navigation wholly free. Yet this bridge was a connecting bond of a great highway; it was, itself, a highway, at once intra-territorial, and leading to intercourse between the states. But the fact that it was below a port of entry, Pittsburgh, was fatal to it.

[McLean, J., giving the opinion of the court, in which he places reliance on the fact that the bridge was erected below a port of entry, says: "The fact that the bridge constitutes a nuisance is ascertained by measurement. If obstruction exists, it is a nuisance. An indictment at common law could not be sustained in the federal courts by the United States against the bridge as a nuisance, as no such procedure has been authorized by congress; but a proceeding on the ground of a private and irreparable injury may be sustained against it by an individual or a corporation. Such a proceeding is common to the federal courts, and also to the courts of the state. The injury makes the obstruction a private nuisance to the injured party; and the doctrine of nuisance applies to the case where the jurisdiction is made out, the same as in a public prosecution. * * * The powers of a court of chancery are as well adapted, and as effectual for relief in the case of a private nuisance, as in either of the cases named." In Devoe v. Penrose Ferry Bridge Co. [Case No. 3,845], which was a bill to enjoin a bridge below Philadelphia, over the Schuylkill, a river much smaller and shallower than this—like it, wholly in one state—far more than it, in its history the subject of regulation by the state in which it lies—a stream eminent for the finny tribes which haunt the sedge and ooze, but not whitened in its muddy sloth by sails of commerce—a stream bridged everywhere at the city—in regard to which congress may be said never to have legislated—Greer, J., granted an injunction to stay a bridge about to be erected under the authority of the commonwealth of Pennsylvania. The court there said: "The jurisdiction in cases like the present has been fully considered and decided in State v. Wheeling Bridge [13 How. (54 U. S.) 519]. The court is not at liberty, even if so disposed, to disregard the authority of that case. It is there decided that although the courts of the United States cannot punish by indictment the erection of a nuisance on our public rivers, erected by authority of a state, yet that, as courts of chancery, they may interfere at the instance of an individual or corporation who are likely to suffer some special injury, and prohibit by injunction the erection of nuisances to the navigation of the great navigable rivers leading to the ports of entry within a state." And the court even went out of its way to add, on the authority

Revolution, was charged, for some expressions which he uttered, with deserting Whig politics, after showing, as he did, that the expressions used by him were nearly identical with many found in the writings of the great Whig statesman of the Revolution of 1688, he said, that he did not desire to be thought "a better Whig than Lord Somers." Nor do we—happy if we can rightly follow him—desire to assert the powers of the federal government further than they were asserted by John Marshall. We say, as he did, that the question is one of circumstances—circumstances which every wise judge, as every practical statesman must regard, and in some degree be governed by. Here is a river, on the one hand, having a commerce not vast; and there, too, on the other hand, is a road which is the great line of communication between Boston, New York, Philadelphia, Baltimore, Washington and all the South—a road which has a greater travel upon it perhaps than any road of the world, and which, somewhere, must cross this stream. A principle of law designed to protect commerce between the states must not be so construed as practically grievously to injure it.

[In Devoe v. Penrose Ferry Bridge Co., cited on the other side [supra], and much misunderstood, this court (Grier, J.) said: "At common law every obstruction, however small, to the free navigation of a public river might, in strictness, be styled a nuisance; but the application of this definition to every bridge over every creek where the tide ebbs and flows, or which a chance sloop might occasionally visit, would be absurd, and highly injurious to public interests. Intercourse by means of turnpikes, canals, railroads, and bridges is a public necessity. A railroad constructed by the authority of a state is often many thousand times more beneficial to the interests of commerce than the unlimited freedom of navigation over unimportant inlets, creeks, or bays, or remote portions of a harbor. It would be unreasonable to insist that the millions who travel on them should be subjected to great delay or annoyance for the convenience of a few sloops or fishing-smacks. Where bridges are constructed with draws or openings for the passage of masted vessels, and high enough to permit others to pass under, if possible, the occasional delay of such vessels for a short time may be a trifling inconvenience in comparison with the public benefit of the bridge. In every investigation of this kind, the question is relative, not absolute. Whether a certain erection be a nuisance must depend upon the peculiar circumstances of each case. When the trade of the channel is of great amount and importance, and that across is trifling, the same rule cannot apply as to a case where the conditions are contrary. If a steam ferry can amply accommodate those who cross the stream, and a bridge with a draw would inflict an injury on commerce, and tax the public by increased freight, there is no sufficient reason why a bridge should be erected because it will be more profitable stock than steamboat or towboat, or better accommodate some small neighborhood or neck of land. The city of Boston is situated on a peninsula. No public necessity could well exist which would justify a bridge compelling all the commerce of her port to pass through a draw, while it might be very reasonable that vessels passing from one part of the port or harbor to another should be compelled to submit to some inconvenience for the sake of a bridge erected for one of the great railroads, so important to the prosperity and wealth of the city. It would be an abuse of the term to call the Schuylkill dam a nuisance because it is below tide water, and converts a few miles of useless sloop navigation into a canal which, under the name of the Schuylkill Navigation Company, annually adds millions to the wealth of the city and state, and whose commerce constitutes the staple of this western portion of the port of Philadelphia. Nor is it any appreciable injury to the commerce of the port that vessels with high masts cannot pass the Market Street bridge. Ample space for those vessels still remains at the wharves below. The great staple of this Western port is coal, and this bridge is built of such a height as not to interfere with the passage of the steamtugs and canal-boats engaged in transporting it. The city of Philadelphia now extends across the Schuylkill, and such a bridge (a great thoroughfare across it at the connecting points), is a public necessity. The same may possibly be said of the Gray's Ferry bridge (far lower down the stream), over which the railroad to Baltimore passes. Vessels with masts, and steamboats with high chimneys, are no doubt put to considerable inconvenience in passing the draw; but the bridge is so built that the immense trade in coal can pass by it without interruption." And the court acted in perfect conformity to these principles when, in order to prevent an outlay while points of law and fact were yet contested, and in the interests, therefore, of all parties to the controversy, it granted a preliminary injunction to stay a bridge far down on the Schuylkill river—almost indeed, as it enters the Delaware—the effect of whose erection the city of Philadelphia, by its select and common councils, represented would be greatly to injure it and the whole line of wharves of the Schuylkill river, without any corresponding public benefit whatever. The judge indeed, in that case, misreading apparently, as the court's adjudication in the Wheeling Bridge Case, the expression (dicta simply) of McLean, J., to which we have referred, may have assumed that federal authority was interfered with where it was not, and have expressed itself too strongly in support of a right of final injunction over such a stream. But the final injunction was never granted; and of what avail are such expressions as are cited on the other side, made, as the court declared, but as it has not been noted, con-

trary to its "desire"; and to guard against "unnecessary fears excited"?—expressions never acted on, but the reverse, and which must be taken merely as an illustration of the way in which, when supporting against a powerful argument at the bar a decree which he is about to make, a judge will sometimes press with strength and earnestness, with all the power of statement and illustration, which he possesses, a doctrine which he seeks to establish, and will go almost as far in one direction as counsel have gone in another, responding to extremes by exuberance. He does not then overlay his opinion by all the limitations, and qualifications, and restrictions which he would use were he inditing an academic lecture. Such expressions are natural, and comprehensible as well, to all except to those who cannot see that they were used responsively, and argumentatively, and hypothetically, and by way of illustration, and to exclude conclusions in a matter not requiring action upon them; and that some qualification and limitation of them when action is required and when all the conditions of the problem may be reversed, argues no inconsistency of principle, but, contrariwise, may be the most intelligent form of principles' assertion.

[Reply: Blackbird creek bore no resemblance to the Passaic. It was a mere sluice, up and down which the Delaware estuated. There was no port of entry at its head. It had few or no inhabitants but those such as its name indicates, and no commerce of any kind. The case cited and relating to it does not apply.][2]

GRIER, Circuit Justice. The object of these five several bills is to obtain injunctions prohibiting the erection of certain bridges over the Passaic river. One of these is proposed to be erected at a point called the "Commercial Dock," in the city of Newark, by the New Jersey Railroad & Transportation Company; the other, by the Newark Plank Road Company, near the mouth of the Passaic river and some two and a half miles below the wharves of the port of Newark. The erection of these bridges is authorized by the legislature of New Jersey. They are required to have pivot draws, leaving two passages of sixty-five feet each for the passage of vessels navigating the river or harbor. The first of these bridges is required in order to avoid certain curves in the railroad where it passes through Newark, and to make it straight; the other, to accommodate the large and increasing commerce between the cities of New York and Newark, on the plank road connecting the lower end of Newark with Jersey City. It will not be necessary to a proper consideration of the several questions affecting the decision of these cases, to give an abstract either of the pleadings or the testimony. Where opinions are received in evidence, there can

be no restraint as to quantity. Such testimony is always affected by the feelings, prejudices and interests of the witnesses, and is of course contradictory. A skipper will pronounce every bridge a nuisance, while travelers on plank or railroads will not think it proper that their persons or property should be subject to delay, or risk of destruction, to avoid an inconvenience or slight impediment to sloops and schooners; owners of wharves or docks who may apprehend that their interests may be affected by a change of location of a bridge, are unanimous in their opinion that public improvement had better be arrested than that their interests should be affected. In this conflict of testimony and discordant opinion, we shall not stop to make any invidious comparisons as to the credibility of the witnesses, but assume such facts as we believe to be proven, without attempting to vindicate the propriety of our assertions.

1. The first of the three great questions so ably discusssed by the learned counsel in these cases, is briefly and lucidly stated in the following propositions, which complainants have endeavored to establish: First. That the Passaic river is a public highway of commerce, which under the constitution of the United States has been regulated by congress. Second. That the free navigation of the Passaic river as a common highway having been established by regulation of congress, and by compact between the states, it cannot lawfully be obstructed by force of any state authority or legislation. Third. The bridges proposed to be erected by the New Jersey Railroad Company and Plank Road Company will be each an obstruction to the free navigation of the Passaic river, and public nuisances. Consequently this court will enjoin their erection, on complaint of any injured party.

So far as these propositions involve the facts of the case, we find them to be as follows: The Passaic is a river having its springs and its outlet wholly within the state of New Jersey. Though a small and narrow river it is navigable for sloops, schooners, and the smaller classes of steamboats as far as the tide flows, some miles above Newark; at the upper end, and above this city there are several bridges, with small draws, and difficult to pass. These were all erected by authority of the state, and one of them more than fifty years ago. The city of Newark has been made a port of entry by act of congress [and the United States had surveyed the channel, built two light-houses, "fog-lights," spar-buoys, &c.];[3] has some little foreign commerce, and some with ports of other states. Being in fact but a manufacturing suburb of New York, much the larger portion of her commerce is with that city, and carried on the rail and plank roads connecting them. That the proposed bridges will in some measure cause an obstruction to

[2] [From 3 Wall. (70 U. S.) 782.]

[3] [From 3 Wall. (70 U. S.) 782.]

the navigation of the river, and some inconvenience to vessels passing the draws, is certainly true. Every bridge may be said to be an obstruction in the channel of a river, but it is not necessarily a nuisance. Bridges are highways as necessary to the commerce and intercourse of the public as rivers. That which the public convenience imperatively demands, cannot be called a public nuisance because it causes some inconvenience or affects the private interests of a few individuals. Now, if every bridge over a navigable river be not necessarily a nuisance, but may be erected for the public benefit, without being considered in law or in fact a nuisance, though certainly an inconvenience affecting the navigation of the river, the question recurs, who is to judge of this necessity? Who shall say what shall be the height of a pier, the width of a draw, and how it shall be erected, managed and controlled? Is this a matter of judicial discretion or legislative enactment? Can that be a nuisance which is authorized by law? Does a state lose the great police power of regulating her own highways and bridges over her own rivers, because the tide may flow therein, or as soon as they become a highway to a port of entry within her own borders? In the course of seventy years' practical construction of the constitution, no act of congress is to be found regulating such erections, or assuming to license a bridge, over such a river wholly within the jurisdiction of a state (if we except the doubtful precedent of the Cumberland road), and during all this time states have assumed and exercised this power. If we now deny it to the states, where do we find any authority in the constitution or acts of congress for assuming it ourselves? These are questions which must be resolved before this court can constitute itself "arbiter pontium," and assume the power of deciding where and when the public necessity demands a bridge, what is a sufficient draw, or how much inconvenience to navigation will constitute a nuisance.

The complainants in these several bills, in order to show jurisdiction in the court, have stated themselves to be citizens of the state of New York. Their right to a remedy in the courts of the United States is not asserted, on account of the subject matter of the controversy, nor do they allege any peculiar jurisdiction as given to us by any act of congress; but rest upon their personal right as citizens of another state to sue in this tribunal. It is very apparent, also, that the complainants, if not introduced as mere John Does or nominal parties (while those really contending are used as witnesses) are at least volunteers in the controversy, "post litem motam," who have bought the right to an expected injury for the luxury of the litigation. Without stopping to laud this exhibition of public spirit by citizens of a neighboring state, it is plain by their own showing, that they can demand no other remedy from this court than would be administered by the tribunals of the state of New Jersey in a suit between her own citizens. A citizen of New York who purchases wharves in Newark or owns a vessel navigating to that port has no greater right than the citizen of New Jersey. A court of chancery in New Jersey would not interfere with the course of public improvements authorized by the state, at the instance of a wharf owner on the suggestion that a change in the location of a bridge would cause a depreciation in the value of his property. This is not a result, for which (if the court can give any remedy at all,) it will interfere by injunction. The court has no power to arrest the course of public improvements, on account of their effects upon the value of property, appreciating it in one place and depreciating it in another. If special damage occurs to an individual, the law gives him a remedy. But he cannot recover either in a court of law or equity, special damage as for a common nuisance, if the erection complained of be not a nuisance. A bridge authorized by the state of New Jersey cannot be treated as a nuisance under the laws of New Jersey. That the police power of a state includes the regulation of highways and bridges within its boundaries, has never been questioned. If the legislature have declared that bridges erected with draws of certain dimensions will not so impede the commerce of the river, as to be injurious or become a public nuisance, where can the courts of New Jersey find any authority for overruling, reversing or nullifying legislative acts on a subject matter over which it has exclusive jurisdiction? Admitting, for the sake of argument, that congress, in the exercise of the commercial power, may regulate the height of bridges on a public river in a state below a port of entry, or may forbid their erection altogether, they have never yet assumed the exercise of such a power, nor have they by any legislative act conferred this power on the courts. The bridges will not be nuisances by the law of New Jersey. The United States has no common law offences, and has passed no statute declaring such an erection to be a nuisance. If so, a court cannot interfere by arbitrary decree either to restrain the erection of a bridge or to define its form and proportions. It is plain that these are subjects of legislative not judicial discretion. It is a power which has always heretofore been exercised by state legislatures over rivers wholly within their jurisdiction, and where the rights of citizens of other states to navigate the river are not injured, for the sake of some special benefit to the citizens of the state exercising the power.

But it has been contended, on the authority of a dictum of my own, in Devoe v. Penrose Ferry Bridge Co. [Case No. 3,845], "that the supreme court have decided in the case of Pennsylvania v. Wheeling Bridge, 13 How. [54 U. S.] 579, that although the courts of the United States cannot punish by indictment the erection of a nuisance on our public rivers, erected by authority of a state,

yet that as courts of chancery they may interfere at the instance of an individual or corporation who are likely to suffer some special injury, and prohibit by injunction the erection of nuisances to the navigation of the great navigable rivers leading to the ports of entry within a state." It is true that this doctrine was enunciated as a corollary from the Wheeling Bridge Case, on a motion for an interlocutory injunction against a bridge over a stream wholly within the territory and jurisdiction of Pennsylvania. On such motions I have always refused to hear and definitely decide the great points of a case. If there be a prima facie or even doubtful case shown, it is the interest of both parties that the interlocutory injunction should issue, and that the defendants should not expend large sums in erections which may possibly be treated hereafter by the court as nuisances. In the cases now before us, the same course was pursued; but after the full argument of this question on final hearing, and a most careful consideration of it, I feel bound to acknowledge that the dictum I have just quoted from the report of the Case of the Penrose Ferry Bridge Company is not supported by the decisions of the supreme court in the Wheeling Bridge Case. It is true that such an inference might be drawn from a hasty or superficial examination of the opinion of the court as delivered in that case. But the point now to be considered, was not in that case, and could not, therefore, have been decided. No judge in vindicating the judgment of the court, can deliver maxims of universal application, in every sentence, or oracles which may be read in two ways, one applicable to the case before him, and the other not. To sever the arguments of a judge from the facts of the case to which he refers, will often lead to very erroneous conclusions. The fact that Pittsburg has been made a port of entry may have been mentioned as an additional or cumulative reason why Virginia should not be allowed to license a nuisance on the Ohio, below that city. But the question whether the power to regulate bridges over navigable rivers wholly within the bounds of a state, could be exercised by it below a port of entry, and whether the establishment of such a port did ipso facto divest the state of such a power was not in that case, and therefore not decided. This assertion will be fully vindicated by a careful examination of the record in that case.

1. It must be noted as a circumstance of that case, that although the state of Pennsylvania in her corporate capacity was complainant, and "propter dignitatem" entitled to sue in the supreme court of the United States; yet, that when the bill was filed, the same complaint might have been sustained in the circuit court of the United States, or the bridge might have been prostrated as a nuisance by indictment in the proper state court of Virginia. The bill charged that the bridge proposed to be erected was in utter disregard of the license granted by its charter, which carefully forbid the least interference with the navigation of the Ohio. On the facts charged and proved, a court of chancery of Virginia, would have been bound to enjoin the erection of so palpable a nuisance to the navigation. The case therefore presented every fact necessary to give the court jurisdiction—a party having a right to sue in the court—a nuisance proposed to be erected without the sanction either of Virginia or the United States, and great special damage to the plaintiff.

2. During the pendency of this suit, the legislature of Virginia saw proper to come to the assistance of their corporation, in the unequal contest, and at its suggestion enacted that the bridge proposed to be built contrary to the license granted to the corporation, was according to it, and not therefore to be considered as a nuisance by the laws of Virginia—notwithstanding that the bridge was without a draw and for many days in the year would wholly obstruct the passage of steamboats.

3. This legislation of Virginia being pleaded as a bar to further action of the court in the case, necessarily raised these questions. Could Virginia license or authorize a nuisance on a public river, which rose in Pennsylvania, and passed along the border of Virginia, and which by compact between the states was declared to be "free and common to all the citizens of the United States?" If Virginia could authorize any obstruction at all to the channel navigation, she could stop it altogether, and divert the whole commerce of that great river from the state of Pennsylvania, and compel it to seek its outlet by the railroads and other public improvements of Virginia. If she had the sovereign right over this boundary river claimed by her, there could be no measure to her power. She would have the same right to stop its navigation altogether, as to stop it ten days in a year. If the plea was admitted, Virginia could make Wheeling the head of navigation on the Ohio, and Kentucky might do the same at Louisville, having the same right over the whole river which Virginia can claim. This plea therefore presented not only a great question of international law, but whether rights secured to the people of the United States, by compact made before the constitution, were held at the mercy or caprice of every or any of the states, to which the river was a boundary. The decision of the court denied this right. The plea being insufficient as a defense, of course the complainant was entitled to a decree prostrating the bridge, which had been erected pendente lite. But to mitigate the apparent hardship of such a decree, if executed unconditionally, the court in the exercise of a merciful discretion, granted a stay of execution on condition that the bridge should be raised to a certain height or have a draw put in it which

would permit boats to pass at all stages of the navigation. From this modification of the decree no inference can be drawn, that the courts of the United States claim authority to regulate bridges below ports of entry, and treat all state legislation in such cases as unconstitutional and void.

It is abundantly evident from this statement, that the supreme court, in denying the right of Virginia to exercise this absolute control, over the Ohio river, and in deciding that as a riparian proprietor she was not entitled, either by the compact or by constitutional law, to obstruct the commerce of a supra-riparian state, had before them questions not involved in these cases and which cannot affect their decision. The Passaic river, though navigable for a few miles within the state of New Jersey, and therefore a public river, belongs wholly to that state; it is no highway to other states, no commerce passes thereon from states below the bridge to states above. Being the property of the state, and no other state having any title to interfere with her absolute dominion, she alone can regulate the harbors, wharves, ferries, or bridges, in or over it. Congress has the exclusive power to regulate commerce, but that has never been construed to include the means by which commerce is carried on within a state. Canals, turnpikes, bridges and railroads are as necessary to the commerce between and through the several states, as rivers. Yet congress has never pretended to regulate them. When a city is made a port of entry, congress does not thereby assume to regulate its harbor, or detract from the sovereign rights before exercised by each state over her own public rivers. Congress may establish post offices and post roads; but this does not affect or control the absolute power of a state over its highways and bridges. If a state does not desire the accommodation of mails at certain places, and will not make roads and bridges on which to transport them, congress cannot compel it to do so, or require it to receive favors by compulsion. Constituting a town or city a port of entry, is an act for the convenience and benefit of such place, and its commerce; but for the sake of this benefit the constitution does not require the state to surrender her control over the harbor, or the highways leading to it, either by land or water, provided all citizens of the United States enjoy the same privileges which are enjoyed by her own.

Whether a bridge over the Passaic will injuriously affect the harbor of Newark, is a question which the people of New Jersey can best determine, and have a right to determine for themselves. If the bridges be an inconvenience to sloops and schooners navigating their port, it is no more so to others than to them. I see no reason why the state of New Jersey, in the exercise of her absolute sovereignty over the river, may not stop it up altogether, and establish the harbor and wharves of Newark at the mouth of the river.

It would affect the rights of no other state. It would still be a port of entry, if congress chose to continue it so. Such action would not be in conflict with any power vested in congress. A state may, in the exercise of its reserved powers, incidentally affect subjects entrusted to congress without any necessary collision. All railroads, canals, harbors or bridges necessarily affect the commerce not only within a state, but between the states. Congress, by conferring the privilege of a port of entry upon a town or city, does not come in conflict with the police power of a state exercised in bridging her own rivers below such port. If the power to make a town a port of entry includes the right to regulate the means by which its commerce is carried on, why does it not extend to its turnpikes, railroads and canals, to land as well as water? Assuming the right (which I neither affirm or deny) of congress to regulate bridges over navigable rivers below ports of entry, yet not having done so, the courts cannot assume to themselves such a power. There is no act of congress or rule of law which courts could apply to such a case. It is possible that courts might exercise this discretionary power as judiciously as a legislative body, yet the praise of being "a good judge" could hardly be given to one who would endeavor to "enlarge his jurisdiction" by the assumption, or rather usurpation, of such an undefined and discretionary power. The police power to make bridges over the public rivers is as absolutely and exclusively vested in a state as the commercial power is in congress; and no question can arise as to which is bound to give way, when exercised over the same subject matter, till a case of actual collision occurs. This is all that was decided in the case of Wilson v. Blackbird Creek, 2 Pet. [27 U. S.] 257. That case has been the subject of much comment, and some misconstruction. It was never intended as a retraction or modification of any thing decided in Gibbons v. Ogden [9 Wheat. (22 U. S.) 1], or to deny the exclusive power of congress to regulate commerce. Nor does the Wheeling Bridge Case at all conflict with either. The case of Wilson v. Blackbird Creek [supra], governs this—while it has nothing in common with that of the Wheeling bridge.

The view taken by the court of this point dispenses with the necessity of an expression of opinion on the questions on which so much testimony has been accumulated, what is the proper width of draws on bridges over the Passaic? How far the public necessity requires them? What is the comparative value of the commerce passing over or under them? What the amount of inconvenience such draws may be to the navigation, and whether it is for the public interest that this should be encountered rather than the greater one consequent on the want of such bridges? and finally, the comparative merits of curved and straight lines in the construc-

tion of railroads. These questions have all been ruled by the legislature of New Jersey, having (as we believe) the sole jurisdiction in the matter. They have used their discretion in a matter properly submitted to them, and this court has neither the power to decide, nor the disposition to say, that it has been injudiciously exercised.

II. The second great question in this case is not affected by the conditions of the first. The court has undoubted jurisdiction to administer the relief here sought, if the complainants have shown themselves entitled to it. It is charged that the corporation called the "Proprietors of the Bridges over the Rivers Passaic and Hackensack" have a right to bridge these rivers "exclusive of all other persons whatsoever, in such manner as that no other bridge can be erected within said limits until the expiration of 99 years from the date of said original act (1790), without the consent of said proprietors." It is contended, also, that a majority of the stockholders cannot by law surrender or release this exclusive privilege or franchise, and that any law assuming to take away or authorizing any invasion of such franchise, impairs the obligation of the original and fundamental contract with and between the stockholders, and is therefore unconstitutional and void; and as a consequence, this court having jurisdiction of the parties, is bound to protect their franchise from invasion, on the complaint of any individual stockholder.

In order to a clear understanding of this point, it will be necessary to give a brief, but, nevertheless, a somewhat tedious history of the legislative and other transactions connected with it. Previous to the year 1790, the Passaic and Hackensack rivers had been crossed by means of ferries only. In that year the legislature of New Jersey passed an act "for building bridges over the Passaic, Hackensack," &c. As this act is somewhat anomalous in its provisions, and subject to misconstruction, it will be necessary to notice some of its provisions. The first section nominates certain commissioners, "who are authorized to put in execution the several services intended by this act." They are required to view the ground from Newark to Powles Hook, and fix upon the most suitable and convenient site for a bridge, and are authorized to erect, or cause to be erected, a bridge over each of these rivers. The bridges must have a draw of 24 feet, lamps, &c. After having agreed upon the sites of the bridges, they are required to lay out the roads to them. If the bridge be fixed at the ferry, the commissioners were to pay for the ferry rights; they were authorized also, at their discretion, to contract and agree with any person or persons who would undertake to build such bridges for the tolls allowed by the act; and for so many years, and upon such conditions as, in the discretion of the commissioners, should seem expedient. This agreement must be reduced to writing, signed and sealed by the parties thereto, and recorded, "and to be binding on the parties contracting as well as the state of New Jersey, and as effectual as if the same and every part, covenant and condition thereof had been particularly and expressly set forth and enacted in this law." The 15th section enacts "that it shall not be lawful for any person whatsoever, to erect or cause to be erected any other bridge or bridges over or across the said river Passaic, between its mouth and second river, &c." In February, 1793, these commissioners entered into a contract, by indenture, with some thirty other gentlemen, reciting their powers under the above act. By this deed they "demised, granted, and to farm let" the said bridges to be erected "as hereinafter declared, over said rivers, together with all tolls appertaining thereto." "To have and to hold the said bridges, with their respective tolls and profits, hereinbefore mentioned, &c., for a term of 97 years. In 1794 the stockholders in this company are constituted a body politic and corporate, by the name of the "Proprietors of the Bridges over the Rivers Passaic and Hackensack." In 1832, "the act to incorporate the New Jersey Railroad Company" was passed. As the proprietors of the bridges had claimed the sole right to build bridges over the Passaic and Hackensack on the proposed route of the railroad, the legislature, with a laudable regard for private rights, authorized the railroad company to purchase turnpike roads and bridges on the route, or any and all the shares of the capital stock of such roads and bridges. The stockholders were to be paid the par value of their stock, or have railroad stock to the same amount. As the stockholders in the bridge company were probably the persons most interested in obtaining the railroad charter, the act did not make it compulsory on the stockholders to accept the value of their stock in money, or railroad stock, but left it to the two corporations to arrange the matter among themselves. No difficulty appears to have been apprehended, as the railroad was authorized to purchase the stock, and thereby control the other corporations, and more especially as the wealthy and respectable men who owned the stock of the first were those most deeply interested in the last. The act, while it contemplated that the railroad corporation should have the control of both the turnpikes and bridges, did not permit the smaller corporations to be absorbed or annihilated by the greater, but ordained that the roads and bridges should be preserved and governed by the provisions of their respective charters. Accordingly, in November, 1832, the railroad corporation entered into an agreement with the "proprietors of the bridges," reciting the authority conferred on the railroad, and that the parties had agreed upon the terms of sale of the stock of the bridge company; and stipulating that the railroad pay to the stockholders of the bridge company $150 for every share of

their stock. It provided that the stockholders electing to receive payment for their stock according to this agreement, should show their assent before the first of January following, and might elect to receive money or railroad stock to same amount, reserving their "franchise privileges" as before held, and reserving also "all grants or privileges theretofore made by way of commutation." The reservations were made to meet the exigency of the proviso to the 10th section of the act of incorporation of the railroad company —"That nothing herein contained shall be so construed as to impair any reversionary interest or vested rights which the state or any incorporated company or individual may possess in virtue of an act for building bridges, &c., passed in 1790," &c. By this agreement the railroad is permitted either to use the old bridge or erect another along side, but so as not to obstruct, hinder, or interrupt the travel over the old bridge. In pursuance of their act of incorporation and of their agreement, the railroad bought some 930 of the 1,000 shares into which the stock of the "proprietors of the bridges," &c., was divided, at the price of $150 for each share of $100. They erected a railroad bridge at the end of Centre street, which has been used for upwards of twenty years. As a new bridge is now found necessary, and as the position of the old one requires sharp curves of the railroad through the streets of the city, which are not only inconvenient but dangerous, a supplement to the act incorporating the railroad was passed on the 3d of April, 1855, authorizing the construction of the bridge at Commercial Dock, and the removal of the old one at Centre street, and of the railroad track connected therewith. It requires the new bridge to have two draws, each at least 65 feet wide, on which a light must be kept at night, and a careful person to open the draws for free passage of vessels, with the same provision as to reversionary interests as is found in the 10th section of the original act. It requires also the consent of the "proprietors of bridges," &c., in writing, under the corporate seal, and that the giving of such consent shall not, except as to the said bridge so consented to, be construed, held, or deemed in any manner to strengthen or impair any rights or privileges which the said "proprietors may possess."

It is not worth while, for the purposes of this case, to inquire whether the "proprietors of the bridges," &c., can claim any franchise of greater extent than that contained and accurately defined in their written agreement with the commissioners. It clearly does not confer on them a right to build any other bridges than the two described and specified, or take tolls therefrom. They cannot be said therefore to have a monopoly for building of bridges within the boundaries specified in the act. The instrument called a lease or agreement defines the rights and the extent of the franchise granted to the company; and

it may well be doubted whether the provisions of the 15th section, which are wholly omitted from their charter, can be invoked as any part of their franchise. Nevertheless, as the legislature of New Jersey seem to have treated this section as in the nature of a covenant by the state not to permit other bridges to be erected which might injure the value of the franchise conferred on the "proprietors" by the commissioners without the consent of the corporation, we shall treat it as such—at best it is no more. If the proprietors had the sole right to build bridges and take tolls, their whole franchise might have been condemned by the legislature under their right of eminent domain. A title to a franchise is of no higher quality than a title to land. Such indiscreet contracts by a legislature cannot paralyze the arm of government and stop the progress of improvement for a century. The legislature without attempting to define their rights or compelling them to renounce them for a proper consideration have merely suggested a very easy mode of getting over the difficulty. The railroad is authorized to purchase out the whole stock and franchise of the bridge company, by paying the full value thereof. Those stockholders who did not choose to accept such terms know well the purpose and object of this transaction was to give to the railroad corporation the control of this claim to a monopoly, whatever might be its validity or extent, without a destruction of the other corporate privileges and faculties. An acquiescence for more than twenty years in the exercise of this right by the railroad will hardly leave room to question it now, even if a majority of the stockholders should now be disposed to do so. But the parties now objecting, do not seem absolutely to deny the right of the railroad company to have a bridge over the Passaic somewhere, provided it be built so as to suit the private interest of certain wharf owners. Their franchise to receive tolls and pass free on their own bridge will not be impaired by the change. Nor is there any evidence that the value of the bridge stock will be in any manner affected thereby. When the legislature have decided that the public interests require the change of location of the track of a railroad, or a bridge connected with it, a court cannot be called on to enjoin such a change because it will cause a depreciation of property adjoining it, nor can members of the bridge corporation in this case call for the intervention of the court to protect them against the acts of the majority of the corporators, unless for some abuse of power, to the injury of the corporate privileges or property of the minority. It is no part of the corporate franchise of the proprietors, &c., that any of its stockholders who may chance to be wharf owners, shall wield their corporate privileges to enhance the value of their wharves. This change of the position of the railroad bridge is authorized by law. It has the consent of the "proprietors," given in the

manner pointed out by law, under the seal of the corporation. In giving this assent the corporation was acting within the scope of its powers, and in a case where the will of the majority must necessarily govern, when lawfully expressed. This is not a case where a majority of the stockholders are employing the common fund for the accomplishment of a purpose not within the scope of the institution. The majority must decide what is proper compensation for any real or supposed injury to their franchise of toll, which may result from the change of position of this railroad bridge. If it be part of their franchise to license other bridges, such a franchise can only be exercised by the corporation under their common seal and at the will of a majority. But it is plain that another bridge erected without legislative authority might have been treated as a nuisance, for whatever may have been considered the nature of the supposed monopoly, neither the law, nor their own lease, authorized them to build another bridge, or to give a valid license to others. The legislature admit that they are bound by contract not to authorize another bridge; but on the principle of "volenti non fit injuria" they have directed the railroad to obtain the consent of the corporation with whom this contract was made; whether this covenant was made with them originally as partners or corporators, can make no difference in the case. In neither case can a single individual by his negative vote control the majority of the body, or compel it to give or refuse its consent as may suit the interest of an individual or a minority. This supposed franchise of forbidding the legislature from licensing a bridge over these rivers seems to have been a puzzle for the learned lawyers of the state for half a century past; and, as it is claimed by a large number of highly respectable, influential and wealthy men, it has been treated with great reverence by the legislature, and the more so, as the lawyers could not agree in defining what it was. Some have fancied it an incorporeal hereditament in each stockholder, which cannot be affected by the act of another, having the quality of a polypus; and though divided into one thousand parts or pieces, each one became a unit, or distinct whole; others have treated it as a right of common, in which "quilibet totum habet et nihil habet," an indivisible unit of which, if a man has not the whole, he has nothing—and consequently a majority cannot dispose of it. But we do not think it necessary to search the lumber garret of obsolete law, in order to give a show of profound legal learning to an absurd conclusion. The provisos in the different acts of legislature, which have been invoked as conferring this power of obstruction on each one of one thousand partners or stockholders, make no new grant of power or franchise, and clearly refer to other valuable privileges, without being open to such misconstruction. Having, then, such evidence of the consent

of the corporation as is required by law, we cannot say it is insufficient. The allegations in the bill, of irregularity or fraud in the election of the officers of the corporation, and obtaining the act giving such consent, even if sufficiently pleaded, have not been proved, and require no further notice. I am of opinion, therefore, on this point of the case, that the complainants have shown no legal right as stockholders of the corporation of "proprietors," &c., to interfere and overrule the act of the corporation. Nor have they alleged or shown such an improper use of the common property of the corporation, or such deviation from its original purpose, or abuse of the trusts confided to it, as will entitle them to the interference of a court of equity.

The third and last question for consideration, is, whether the railroad company has, by any valid contract, covenanted or agreed with the complainant, or those under whom they claim as assignees, that the railroad bridge over the Passaic shall be forever fixed at Centre street, so that the company cannot, even with consent of the legislature, and for their own and the public benefit, change the location of the bridge, shorten their road, and avoid difficult and dangerous curves. As we have already seen, the question of the expediency or necessity for this change of route on the road, is one not submitted to the judgment or discretion of the court. If the legislature has authorized it, the railroad have a right to proceed, unless bound by contract to maintain their bridge where it at present stands. The answer denies the existence of any such contract. Assuming that a contract which is to have the effect of forever restraining the improvement of this road at this point can be proved by parol, those who aver it, must be held to clear, consistent, and undoubted evidence, as to the parties, the consideration and the precise terms of such contract. Have we such proof?

Without wishing to make any remarks which may appear offensive to any of the highly respectable witnesses who have given such contradictory accounts of the transaction, it is too plain to be overlooked, that much of this conflict arises from the examination of persons as witnesses who are the real parties in interest. The transfer made post litem motam in order to constitute the complainant a party to the suit, is a veil too transparent to conceal the real parties to the litigation. But waiving this objection to the testimony of certain witnesses, as also any invidious comparison of the credibility of very respectable men, I must say that there is not such clear evidence of a contract, its consideration, its parties or its terms, as would justify a court in decreeing its specific execution. It appears that originally the railroad company had purchased the Commercial Dock property, with the view of erecting their bridge there. As the town of Newark was then built, the railroad would pass along its lower boundary. At this time railroads were

an untried experiment. It was a popular notion that it would be of great advantage to a town or city to have a railroad pass through its most frequented streets, that it would advance the value of property on the streets through which it passed, and increase their commerce; and that curves in a railroad were preferable to straight lines, being much more graceful and no less useful. From the prevalence of these notions, the popular feeling became much excited; and the more so, that certain individuals of wealth and influence, who owned wharves on the river, had shrewdly discovered that it would add considerably to the value of their property, if the railroad instead of crossing below it, could be bent round behind it, and crossing above, create an obstruction to the navigation of the river above their wharves. Public meetings were held, exhorting, entreating, and advising the railroad directors.—Suits were brought by lotholders in the name of the attorney general, threatening them with injunctions. Some wanted one thing, some another, and the result is perhaps best described in the graphic language of one of the witnesses: "I can only say, that according to my recollection now, there was much confusion and conflict of wishes among all the parties, and I don't know how many parties I could count up. I know there were sharp speeches and feelings exhibited, as much so as upon any thing I ever saw in this town, and to my view at the present moment, they were like two dogs that had been quarreling, until they got tired and left off, and there was a sort of a common consent to abandon the conflict, and not to keep the progress of the work from going on, by a general assent of making the bridge, where it is now. The location of the bridge was the result, but that there was any contract or agreement that was to be final and conclusive and not to be revoked, I know no such arrangement as that. There was a cessation of the conflict and the work went on." The directors, desirous of conciliating the people of Newark, and expediting the completion of their road, yielded to the pressure, and passed the following resolution, which had the effect of allaying the excitement. It is dated on the 24th of September, 1834, and is as follows: "Whereas, considerable diversity of opinion has prevailed among the citizens of Newark relative to the location of the railroad bridge across the Passaic river, and the location mentioned in the annexed resolution having been agreed upon as a mutual accommodation of conflicting interests, and with a view to the settlement of all matters of controversy; now, therefore, be it resolved, unanimously, that the railroad bridge be located across the Passaic river at the north end of the dock owned by Moses Dodd, with a draw of forty-five feet in width; provided that the right of way from the westerly termination of said bridge to the entrance of the avenue on Market street can be obtained on reasonable terms; and provided also, that the owners

of property on the above mentioned part of the route of the railroad shall agree that the company may use any moving power thereon which they shall deem proper." And on the 26th of December, the following resolution was passed: "Whereas, it is desirable that the bridge across the Passaic river be definitely located, and whereas further delay, in order that all difficulties may be removed, is not deemed expedient, therefore, resolved, that the bridge across the Passaic river be, and the same is, hereby definitely located, immediately north of the dock lately owned by Moses Dodd." These resolutions of the board, for the purpose of proposing an accommodation of conflicting interests and putting an end to the controversy, seem to have brought the dispute to a close, and received general acquiescence. But these documents exhibit no contract, binding the corporation never to change the location of the road and bridge under any change of circumstances. They accordingly retained the Commercial Dock property, which was originally purchased for the purpose of a bridge. This proposition and resolution of the board was for the sake of peace. Those without had conflicting interests—they were bound to no conditions, they gave no consideration, except "ceasing to quarrel when they got tired." Even the parties who had brought suits to frighten the directors where not bound to withdraw them. The directors exercised their own discretion under the circumstances. But time, which changes all things, has produced a great change in the circumstances.—Newark has become a great city. Locomotives moving at a velocity of forty miles an hour, which were then considered but the dream of the projectors, are now established facts. Curves have given way to straight lines, and the notion that railroad cars darting through the most frequented streets of a city are neither a convenience nor a benefit, has become obsolete. The conflicting interests which inexperience and ignorance had originally produced, need no longer to be propitiated for the sake of peace. The people of Newark no longer object to having the bridge located where it was originally intended to place it, and the people of New Jersey, by their legislature, have determined that it would be beneficial to the public to have the old bridge, with its narrow and troublesome draws, taken away, a new one erected below with larger and better draws, and that the railroad should pass through the city by the shortest route—by a straight line, and not with short curves. The complainants have shown no contract made by themselves with the railroad company, nor have they shown any covenant running with the land on which they as assignees are entitled to a remedy at law, or relief in equity.

Having thus disposed of the three great points so ably discussed by the learned counsel, the minor issues of fact or law have become immaterial, and need no further notice.

Let a decree be entered in each of these cases dismissing the bill, with costs.

[These cases were taken on appeal to the supreme court, where, the court being equally divided, the judgment of the circuit court was in consequence affirmed. See 24 How. (65 U. S.) Append. 1.]